

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:26-cr- 70 |
| v. | 18 U.S.C. § 1035<br>False Statements Relating to Health Care<br>Matters<br>(Count 1) |
| JAIR BARBOUR, | |
| *Defendant*. | Forfeiture Allegation |

**CRIMINAL INFORMATION**

THE UNITED STATES CHARGES THAT:

**GENERAL ALLEGATIONS**

Between in or around May 2022 and in or around December 2025, unless otherwise stated:

<u>Virginia Medicaid Mental Health Programs</u>

1.      The Virginia Medicaid Program ("Medicaid"), a "health care benefit program" as defined by United States Code 18 U.S.C. § 24, provides medical assistance to individuals in Virginia who meet certain eligibility requirements. The United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare and Medicaid Services ("CMS"), and the Commonwealth of Virginia, Department of Medical Assistance Services ("DMAS") administer and supervise the administration of the Medicaid program in Virginia. The United States contributes approximately fifty percent of the cost to the Medicaid program.

2.      Individuals who receive benefits under Medicaid are commonly referred to as "beneficiaries" or "recipients."

A.      **Mental Health Skill Building and Intensive In-Home Services**

3.      DMAS authorizes health care providers to render mental health counseling services

1

under programs called Mental Health Skill Building ("MHSB") and Intensive In-Home Services ("IIH"), among other programs. MHSB is for individuals over 21 years old, and IIH is for individuals under 21 years old.

4.    MHSB services were provided by a mental health counselor and focused on training related to the recipient's health and safety, including personal hygiene, communication skills, and stress management and coping skills; activities of daily living, including independent use of community resources such as public transportation; and medication management, including adherence to recommended medical care and attending medical appointments.

5.    IIH services were provided by a mental health counselor and focused on intensive therapeutic interventions in the youth's residence for the purpose of improving family functioning by addressing both interpersonal relations between family members and significant impairments in the youth's major life activities. IIH services were designed for youths who were at risk of being moved into an out-of-home placement or who were being transitioned to home out-of-home.

6.    MHSB and IIH services were required to be provided one-on-one (provider and client), and not in a group setting.

7.    MHSB and IIH were calculated and reimbursed in unit measurements of time per day. For MHSB, one unit is 1–2.99 hours in a day, and two units are 3 or more hours in a day. For IIH, units corresponded to individual hours, *e.g.*, one unit is 1 hour, two units is 2 hours, and so on. MHSB services were reimbursed at a rate between of $91 and $103 per unit, depending on the timeframe, and IIH services are reimbursed at a rate between $60 and $75 per unit, depending on the timeframe. Medicaid did not permit providers to "round up" the amount of time they spent with clients; if a provider claimed one hour of services, the provider claimed to provide 60 active minutes of qualified services to the client.

8.    MHSB and IIH must be provided by either a Licensed Mental Health Professional ("LMHP") or a Qualified Mental Health Professional ("QMHP"). LMHPs possess an advanced license, such as a license to work as a clinical psychologist or clinical social worker. QMHPs possess a bachelor's degree and have a requisite level of training and experience in providing behavioral health services.

9.    All billing for MHSB and IIH services must be supported by a comprehensive needs assessment and an individual service plan for the given recipient, as well as individualized progress notes documenting the services provided for each billed claim. The mental health professional (either the LMHP or QMHP) who provided the services is responsible for drafting a progress note for each counseling session that results in a claim billed to Medicaid.

10.    Progress notes must document the recipient's individual circumstances, treatment, and progress, as well as the individualized interventions the counselor provided. The progress notes must include the name of the service rendered, the date and time of the service, the signature and credentials of the person who rendered the service, and the setting in which the provider rendered that service.

### B.    Crisis Stabilization

11.    Effective December 1, 2021, DMAS launched new mental health programs, including a program called Crisis Stabilization. Over time, DMAS has used different names for the Crisis Stabilization program, including "Community Stabilization" and "Family Stabilization," all of which refer to the same general type of service.

12.    Crisis Stabilization services were designed to help recipients experiencing a short-term crisis to transition from a high level of care to a relatively lower level of care. The services were available 24 hours a day, seven days a week, to individuals who recently experienced an

acute or significant behavioral health crisis. Given the goal of transitioning clients to lower levels of care, Crisis Stabilization services were designed to typically last no more than one or two weeks.

13.    Initially, DMAS authorized providers to provide up to 28 hours of Crisis Stabilization services within a seven-day period. Providers could submit authorization requests to the relevant Medicaid contractor to extend a client's Crisis Stabilization services, typically for an additional seven days, if medically necessary. In September 2022, DMAS began requiring providers to submit service authorizations to the relevant Medicaid contractor to initiate Crisis Stabilization services for a client. Upon receiving a service authorization, the contractor would either disapprove the client's participation in Crisis Stabilization or approve services for a certain number of hours over a specified timeframe based on medical necessity.

14.    Virginia Medicaid required that providers offer Crisis Stabilization services to a single recipient at a given time, in one-on-one and face-to-face interactions with the recipient. Virginia Medicaid did not allow providers to treat multiple recipients simultaneously, nor to provide remote treatment by telehealth or other remote means.

### Defendant and Her Co-Conspirators

15.    Defendant JAIR BARBOUR worked for a company named Live 4 Life, Inc. from about in or around May 2022 to in or around March 2023. Live 4 Life was a mental health agency that provided services to Medicaid recipients. The agency was located in the Eastern District of Virginia (specifically, in the area of Richmond, Virginia), and the agency marketed its services to clients in central Virginia.

16.    While employed at Live 4 Life, BARBOUR was a QMHP, and she provided Mental Health Skill Building and Crisis Stabilization services.

17.    BARBOUR also worked for a company named Divine Youth Counseling LLC

from in or around March 2023 to in or around mid-2025. Divine Youth was a mental health agency that provided services to Medicaid recipients. The agency was located in the Eastern District of Virginia (specifically, in the area of Richmond, Virginia), and the agency marketed its services to clients in central Virginia.

18.     While employed at Divine Youth, BARBOUR was a QMHP, and she provided Mental Health Skill Building, Intensive In-Home, and Crisis Stabilization services.

19.     At the direction of the owners of Live 4 Life and Divine Youth, BARBOUR drafted progress notes for services she did not perform, drastically inflated the number of hours she claimed to perform, incorrectly claimed that more providers were present in specific sessions when they were not, and drafted progress notes for the two companies that purported to reflect BARBOUR's provision of services to different Medicaid recipients at the exact same times. The total amount of fraud loss associated with BARBOUR's false and misleading representations (and the concomitant loss amount to Medicaid reasonably foreseeable to BARBOUR for purposes of U.S. Sentencing Guidelines § 2B1.1) is $345,670.93.

## COUNT ONE
(False Statements Relating to Health Care Matters)

20.     The preceding allegations are incorporated herein.

**Live 4 Life**

21.     At Live 4 Life, from in or around May 2022, through in or around March 2023, in the Eastern District of Virginia, the defendant, JAIR BARBOUR, knowingly and willfully made and used a materially false writing and document, to wit, at least one progress note purporting to reflect BARBOUR's provision of mental health counseling services, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, including descriptions of services BARBOUR had not rendered, in connection with the delivery of health care benefits, items, and

services involving a health care benefit program as defined by 18 U.S.C. § 24(b).

22.     The objects of the scheme were for BARBOUR and her co-conspirators to enrich themselves by, among other actions: (a) obtaining health care benefit payments from Medicaid for services that were never provided; (b) concealing that Medicaid claims were false and fraudulent; and (c) diverting proceeds of the fraud—that is, the fraudulently-obtained Medicaid reimbursements—for the personal use and benefit of BARBOUR and her co-conspirators, and to further the fraud.

23.     BARBOUR submitted progress notes for MHSB and Crisis Stabilization services that, in truth and in fact, she did not render. BARBOUR knew the progress notes she submitted were false and fraudulent, and she submitted them for the purpose of substantiating fraudulent billing claims that BARBOUR knew her co-conspirators would submit to Medicaid for payment.

24.     In total, BARBOUR submitted approximately 372 fraudulent progress notes purporting to reflect over 1,116 hours of MHSB services provided to two different Medicaid recipients. BARBOUR drafted and submitted these progress notes knowing full well that the services described in the progress notes were never rendered and that Live 4 Life would use the progress notes to bill Medicaid.

25.     BARBOUR submitted approximately 251 progress notes purporting to reflect that she provided MHSB services to Individual 1, a Medicaid recipient, between May 2022 and July 2023. BARBOUR claimed in these notes that she provided a total of approximately 753 hours of MHSB services to Individual 1. In truth and in fact, Individual 1 rarely met with BARBOUR, and spent even less time receiving mental health services. Individual 1 reported that BARBOUR contacted them once or twice a month, and they met in person only about six times. Phone records establish that BARBOUR and Individual 1 in fact talked for a total of about five total hours over

15 months. BARBOUR also drafted progress notes reflecting times of her purported sessions with Individual 1 that often conflicted with times Individual 1 was clocked in at Individual 1's place of employment. Despite this minimal contact, BARBOUR submitted progress notes documenting the hundreds of hours of services noted above, for which Live 4 Life billed Medicaid $55,901.72.

26.     BARBOUR also wrote progress notes for Individual 1 that conflicted with the times BARBOUR was purportedly providing services for her clients at Divine Youth during the timeframe when BARBOUR was working for both companies. For example, on or about March 5, 2023, BARBOUR claimed to work 15 hours in a day between Live 4 Life and Divine Youth clients, submitting progress notes that reflect overlapping (that is to say, impossible) services:

   a. BARBOUR completed progress notes that claimed she had provided services to Individual 1, a Live 4 Life client, from 9 am to noon;

   b. BARBOUR completed progress notes that claimed she had provided services to a Divine Youth client from 8 am to 11 am;

   c. BARBOUR completed progress notes that claimed she had provided services to a Live 4 Life client from 12:15 pm to 3:15 pm;

   d. BARBOUR completed progress notes that claimed that she had provided services to a Divine Youth client from 11:15 am to 2:15 pm.

27.     BARBOUR also submitted approximately 121 progress notes claiming she provided MHSB services to Individual 2, a Medicaid recipient, between November 2022 and June 2023. BARBOUR claimed in these notes that she provided a total of approximately 363 hours of MHSB services to Individual 2. In truth and in fact, Individual 2 was not familiar with BARBOUR and did not receive services from BARBOUR.

28.    BARBOUR also wrote progress notes for Individual 2 that conflicted with the times she was allegedly providing services for different clients at Divine Youth during the timeframe that BARBOUR was working for both companies. For example, on or about March 14, 2023, BARBOUR claimed to work 20 hours between Live 4 Life and Divine Youth clients, submitting progress notes that reflect overlapping (that is to say, impossible) services:

a.    BARBOUR completed progress notes that claimed she had provided services to Individual 2, a Live 4 Life client, from 5 pm to 8 pm;

b.    BARBOUR completed progress notes that claimed she had provided services to Divine Youth clients from 3 pm to 6 pm and from 6 pm to 10 pm.

**Divine Youth**

29.    At Divine Youth, from in or around March 2023, through in or around mid-2025, in the Eastern District of Virginia, the defendant, JAIR BARBOUR, knowingly and willfully made and used a materially false writing and document, to wit, at least one progress note purporting to reflect BARBOUR's provision of mental health counseling services, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, including descriptions of services that BARBOUR had not rendered, in connection with the delivery of health care benefits, items, and services involving a health care benefit program as defined by 18 U.S.C. § 24(b).

30.    The objects of the scheme were for BARBOUR and her co-conspirators to enrich themselves by, among other actions: (a) obtaining health care benefit payments from Medicaid for services that were never provided; (b) concealing that Medicaid claims were false and fraudulent; and (c) diverting proceeds of the fraud for the personal use and benefit of BARBOUR and her co-conspirators, and to further the fraud.

31.     BARBOUR submitted progress notes for Mental Health Skill Building, Intensive In-Home, and Crisis Stabilization services that, in truth and in fact, she did not render. BARBOUR knew the progress notes she submitted were false and fraudulent, and she submitted them for the purpose of substantiating fraudulent billing claims that BARBOUR knew her co-conspirators would submit to Medicaid for payment.

32.     In addition to overlapping and thus fraudulent progress notes between Live 4 Life and Divine Youth Services described previously, BARBOUR also claimed to provide services to multiple Divine Youth recipients at the same time.

   a. On or about March 19, 2023, BARBOUR claimed to work 23 hours between Live 4 Life and Divine Youth. BARBOUR completed progress notes that claimed she had provided services to two different Divine Youth clients from 8 am to 11 am and 8 am to noon;

   b. On or about March 20, 2023, BARBOUR claimed to work 23 hours between Live 4 Life and Divine Youth, and she completed progress notes that claimed she had provided services to two different Divine Youth clients from 11:30 am to 3:30 pm and noon to 3 pm.

33.     Providers that offer Crisis Stabilization in teams of an LMHP and a QMHP, or various combinations of two providers, can bill Medicaid for over double the hourly rate authorized by Medicaid for services provided by a single QMHP. Knowing that false statements about the number (and qualification level) of provider staff present during a clinical encounter with a Medicaid recipient would generate a greater amount of Medicaid reimbursement, BARBOUR falsely claimed on Crisis Stabilization progress notes that an LMHP was present during BARBOUR's provision of services to Medicaid recipients, providing Divine Youth with the

9

purported documentation the company needed to bill Medicaid for more reimbursement than the company was legitimately entitled to.

(All in violation of 18 U.S.C. § 1035(a)(2).)

## FORFEITURE ALLEGATION

Pursuant to Rule 32.2(a) Fed. R. Crim. P., the defendant is hereby notified that upon the conviction of the offenses listed in Count One of this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

Property subject to forfeiture includes, but is not limited to:

The sum of at least $345,670.93, which represents the amount of proceeds the offenses charged in Count One, which sum shall be reduced to a money judgment against the defendants in favor of the United States.

If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets.

(In accordance with Title 18, United States Code, Section 982(a)(7) and Title 21, United States Code, Section 853(p)).

Respectfully submitted,

Todd W. Blanche
Acting Attorney General

Date:  June 22, 2026          By: _____
Robert S. Day
Assistant United States Attorney

10